**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

MARY WOLSKI,              )
                            )
            Plaintiff,       )     Case No.  1:08-cv-289-SJM
                            )
       v.                    )
                            )
CITY OF ERIE,             )
                            )
           Defendant.   )

## MEMORANDUM OPINION

McLAUGHLIN, SEAN J., District J.,

      Plaintiff Mary Wolski commenced this civil action under Title I of the Americans with Disabilities Act ("ADA"), 42 U.S.C.A. § 12117(a), and related provisions of the Pennsylvania Human Relations Act ("PHRA"), Pa. Stat. Ann. tit. 43, § 951 *et seq.*, following her termination from employment as a firefighter with the City of Erie.[1] Presently pending before the Court is the Defendant's motion for summary judgment. For the reasons set forth below, that motion will be denied.


## I.  STANDARD OF REVIEW

      Summary judgment is proper only where the moving party has established "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "To demonstrate that no issue is in dispute as to any material fact, the moving party must show that the non-moving party has failed to establish one or more essential elements of its case on which the non-moving party has the burden of proof at trial." *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 424 (3d Cir.

---

[1] This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

2007) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

To survive the motion, the non-moving party must go beyond its pleadings and point to specific facts which demonstrate that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. at 324. An issue is considered "genuine" only if there is a sufficient evidentiary basis such that a reasonable jury could find in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). A factual dispute is "material" only if it might affect the outcome of the action under governing law. *Id.* In adjudicating a Rule 56 motion, we view the underlying facts and all reasonable inferences arising therefrom in the light most favorable to the party opposing the motion – here, the Plaintiff. *McCabe*, 494 F.3d at 424; *Fasold v. Justice*, 409 F.3d 178, 180 (3d Cir.2005).

## II. <u>BACKGROUND</u>[2]

Wolski was hired as a firefighter by the City of Erie in 1997. After initially working as a suppressionist, putting out fires, she eventually became a fire truck driver and performed her duties satisfactorily over the years.

In 2005, Wolski's mother became ill and Plaintiff took extended periods of approved leave from her job in order to care for her mother up until her death on December 24, 2005. The death of her mother caused Wolski significant grief and resulted in her taking additional approved leave time for much of 2006. During these extended absences, city officials maintained contact with Wolski in order to determine that she was receiving proper treatment and to encourage her return to work. No effort was made during this period to terminate, demote, or discipline Wolski as a result of her

---

[2] The following facts are derived from the Defendant's Statement of Material Facts [18], the Plaintiff's Responsive Concise Statement of Material Facts [24], a the parties' respective briefs, and the transcript of proceedings before the Civil Service Commission in accordance with the standard of review recited above.

absences and, in fact, she received numerous sympathetic and supportive contacts from her co-workers.

In conversations with the City's benefits coordinator, Colleen Faytak, Wolski disclosed that she was seeing a psychiatrist, was on medications and was receiving counseling. Wolski eventually agreed to return to work on a part time basis, performing two half-days of light duty per week beginning December 12, 2006.

When December 12, 2006 arrived, however, Wolski did not report to work and the City was unable to contact her. Consequently, Fire Chief Anthony J. Pol sent his deputy, Vance Duncan, to Wolski's residence in order to check on her and assess her well-being. Deputy Chief Duncan's report of the encounter states, in relevant part:

> ... [Wolski] asked me to come in and sit down. She explained that she has been very depressed and has had some suicidal thoughts. She stated she has been going to the doctor and seeing a psychiatrist. She also stated she has begun a new medication yesterday and that the previous medications "did not work." Some medications made her "feel anxious." She said that "the new medication may take several days until it makes her feel better." She also stated that she did not want to talk to anyone today; that is the reason she did not answer the phone when Collen (Faytek) called earlier. She said that she has been depressed due [to] the circumstances (her mother's death last Christmas eve) and she has not been out of the house much.
>
> I told her that we were concerned since she did not answer the phone. We wanted to make sure that she was okay. I also told her that if she needed anyone to talk to, feel free to call myself, Chief Pol, Colleen (Faytek) or [Human Resources Manager] Connie Cook.
>
> She stated that it would probably help if she got out of the house and came back to work. She said that she has not been motivated to [do] anything.
>
> I once again told Mary to call Colleen the next day or two and at the latest to call on Friday. I also restated that she should call either me, Chief Pol or Connie Cook also at anytime to talk.

(See Pl.'s Ex. F [23-8].) After leaving Wolski's house, Deputy Chief Duncan contacted City Hall and related the foregoing events to Chief Pol and Colleen Faytek. He also left a message for Connie Cook and then completed his written report of the incident.

On December 27, 2006, Wolski's immediate supervisor, Lt. Darren Hart, telephoned to check on Wolski in light of it being the anniversary of her mother's death. Wolski advised Lt. Hart that she was "freaking out, but I have my family with me, so I'll be okay."

The following day, Wolski went to the vacant home of her father (who was then hospitalized) and attempted to commit suicide. Inside the house, Wolski disconnected the smoke alarms and disassembled the furnace flue pipe in an attempt to produce carbon monoxide within the residence. She then ingested an overdose of her father's medications. When these suicidal measures failed, Wolski ignited some clothing in the bathtub of the house. Her intent was to create a smoky fire that would result in her death through carbon monoxide poisoning. After lighting the fire, she inflicted several cuts to her neck with a buck knife.

After family members discovered Wolski, City firefighters were dispatched to the scene via a 911 call. At that point, the fire was no longer engaged, but the firefighters sprayed down some areas with water to ensure that any hot spots would not reignite. Plaintiff was taken to the hospital by paramedics and later flown to Pittsburgh for emergency treatment relative to her overdose of medication and smoke inhalation.

In the wake of these developments, the City of Erie commenced a criminal investigation into the events of December 28, 2006. After determining that the fire had been intentionally set, law enforcement officers entered into discussions with the District Attorney about the possibility of filing criminal charges against Wolski. During this time, Wolski was represented by counsel and offered very little in the way of information about the fire.

Meanwhile, in March of 2007, while the District Attorney's office was still evaluating whether to file criminal charges, Wolski approached Fire Chief Pol at a retirement party and inquired about what she had to do to return to work. According to

Wolski, Chief Pol replied that he did not know and "alluded to the fact that... we had to wait until the criminal charges ... were resolved before I could come back to work." (Pl.'s Ex. D [23-6] at p. 7.)[3]

After Wolski's sick leave time expired, Chief Pol advised her that she was being placed on a paid administrative leave effective April 3, 2007 "pending the completion of the investigation on a legal matter concerning you." (Pl's Ex. G [23-9] at p. 5.) Ultimately, the District Attorney declined to file charges based on the anticipated reluctance of the victim (Wolski's father) to participate in the prosecution, the relatively minor damage to his property, the possible difficulty in proving the necessary mens rea, and the mitigating factors involving Wolski herself.

On April 11, 2007, Chief Pol signed a letter of termination directed to Wolski. In relevant part, the letter stated:

> The reasons for this action were referenced in my letter of April 4, 2007, placing you on paid leave pending the completion of the investigation of the December 28, 2006[ ] incident involving you. On that date, you started a fire in your residence, having disconnected the smoke detectors and carbon monoxide detectors, and took an overdose of medication as a suicide attempt. Family members extinguished the fire, but the City firefighting crew was dispatched to your home; and you were taken by helicopter to Pittsburgh for emergency medical treatment to save your life.
>
> This incident renders you presumptively unsuited to be a firefighter, as you pose an ongoing threat to the safety of the public, other firefighters and yourself, having set a fire in a residence. ....

(Defs.' Ex. A [19-2] at pp. 4-5. It is undisputed that present counsel for the City, Gerald Villella, Esq., drafted the letter, and that Chief Pol, Connie Cook, and the Mayor of the City of Erie all had input into the decision to terminate Wolski's employment.

Before sending the letter, Chief Pol contacted Wolski's attorney to inform him of the decision. According to Wolski, her lawyer advised her that same day that there was

---

[3] The page citation refers to the official court pagination located in the header of the document as opposed to the exhibit's internal pagination.

"good news and bad news," *to wit*: although no criminal charges were going to be filed against her, she was going to lose her job with the City. (Pl.'s Ex. D [23-6] at p. 12.)

After she was terminated from her job, Wolski unsuccessfully pursued a grievance procedure pursuant to her collective bargaining agreement. During this process, Wolski was represented by counsel and, because she anticipated pursuing a further administrative appeal to the City's Civil Service Commission, she offered very little information concerning the events of December 28, 2006. Among other things, she would not admit to having set the fire and refused to release her full mental health history.

At some point during this general time frame but after June 26, 2007), Wolski submitted to the City a letter from Lance Besner, M.D, a treating psychiatrist. This letter, dated June 26, 2007, consisted of one sentence indicating that Wolski had been medically cleared to return to work as of March 15, 2007.

Wolski subsequently submitted another letter from Dr. Besner dated August 6, 2007 which purported to summarize Wolski's mental status, both past and present, as well as her medication trials. This letter was received by the City on August 28, 2007, two days prior to the commencement of Wolski's hearing before the City's Civil Service Commission.

As set forth in Dr. Besner's August 6 letter, Wolski in November of 2006 -- approximately one month prior to her attempted suicide -- had displayed a depressed and "mildly anxious" mood. Her affect was "mildly to moderately depressed," but appropriate to thought content. Her range of affect was "mildly restricted" and thought processes were goal directed. She showed no flight of ideas, loosening of associations, delusions, paranoid thoughts, or hallucinations, and she was denying any homicidal or suicidal thoughts. Her insight and judgment were thought to be fair. (Pl.'s Ex. K [23-

13].)  In fact, though it was not referenced in Dr. Besner's report, Wolski had attempted to take her own life on two other occasions prior to December 28, 2006.

As of August 6, 2007, Dr. Besner found Wolski's mood to be good and her affect euthymic and appropriate to thought content.  Her range of affect was normal, and her thought process was goal directed.  She exhibited no flight of ideas, no loosening of associations, no delusions, no paranoid thoughts, and no hallucinations.  She denied any suicidal or homicidal thoughts, and her insight and judgment were felt to be "fair to good."  (Pl.'s Ex. K [23-13].)  As of August 6, Wolski was on a regimen of Wellbutrin, Seroquel, Restoril, and Ativan.  (*Id.*)

On August 30, September 27, and November 20, 2007, the City's Civil Service Commission convened for hearings relative to Plaintiff's challenge of her termination. As provided under Pennsylvania law, Pa. Stat. tit. 53 § 39870, the Commission was charged with determining whether the City had established "just cause" to fire Wolski. In the course of the hearing, both Connie Cook and Chief Pol testified to the circumstances surrounding Wolski's termination.

As to the reasons he did not want Wolski back on the force, Chief Pol told the Commission the following:

> [I]t was presumed she started the fire. ... And my concern is the safety of all my firefighters and the citizens.  And anywhere else where a firefighter starts a fire, they're terminated or go to jail.  The DA decided not to press charges, that's one thing.
>
> But I don't think that I can sit here and say that – with any degree of certainty that firefighters don't have a concern.  Many firefighters have approached me in saying that they don't want to work with her.  If she's in there, they'll transfer out.  They have concerns about her ability to do the job.  And as chief, I have concerns, too.  If she's on medication, being a driver of the vehicle, there was some question about some incidents with her driving.  You know, nothing documented ... fire department's a little bit like a brotherhood.  Some guys didn't want to blow her in, write her up, or do things, so things aren't

documented.  But there were things with firefighters coming back to me that there were concerns about her ability to drive and do the job.

(Def.'s Ex. 3 [19-3] at pp. 82-83.)

Chief Pol spoke to the fact that the City did not receive Dr. Bezner's June 26, 2007 letter until after Wolski had already been fired from her job, despite Dr. Bezner having cleared her to work as of March 15, 2007.  When asked what might have been different, had Wolski presented the letter before being placed on administrative leave, Chief Pol responded:

> If she had presented that letter, I guess maybe that would have started an evaluation process or it would have triggered something that we would have done something differently.  The course of action may have been different for an evaluation.

(Def.'s Ex. 3 [19-3] at p. 84.)

Asked why he thought Wolski might be an ongoing risk in the future, Chief Pol responded:

> Being a firefighter and knowing what fire is and how firefighters respond and how everything happens – to do this and endanger firefighters ... when I asked the question, are firefighters endangered, yes, they're endangered every time they go out the door.  Knowing that – that's critical to me that knowing what you know you would do that.  ... There's nothing that was given to me to change my mind, to say that she is able to come back...

(Def.'s Ex. 3 [19-3] at p. 91.)

Chief Pol further commented on concerns about the possibility of future incidents:

> Because of the dates of the incident coinciding with her mother's funeral, the one-year anniversary, you know, I have concerns in the future what's going to happen next year.  ... I have no proof or anything that I can endanger [sic] – being on medication, driving a fire truck – my job is to protect the firefighters, all of them.  And I can't believe – I can't sit here and say that I want – I can have her back driving a fire truck and fighting fires and endanger other people.  My job is to the firefighter first and to the citizen second.

We have tried – going back to day one, we have tried and tried, through HR, through counseling, through part-time work, through everything trying to get her help.  Trying to get this resolved.  I don't know what else we could do.  You know, we've done this for other people, we bend over backwards.  She ran out her [sic] sick leave, we tried to get her pension.   We were very sympathetic from the start on how to get this done.  It's amazing in Erie this has not been public.  It's out of the newspaper, we've kept everything quiet.  We've done everything we possibly could do.  And there's nothing been given to me to believe that anything would be any different if she were to come back to work.

I just have concerns about the feedback I'm getting from other firefighters about her coming to work and the trust they have.  Firefighting is a very close business, somebody has to have your back, somebody has to drive you there safely and get you there safely, and there's concerns.  And that's the feedback I'm getting.  And as Chief, that's what I'm saying today, nothing has changed my mind to say that she should come back to work.

(Def.'s Ex. 3 [19-3] at pp. 91-93.)

On cross-examination, Wolski's counsel engaged in the following exchange with

Chief Pol:

Q.      Chief, is it your position that because of what happened [Wolski] cannot heal and recover and return to being a firefighter?

A.      There's been nothing to change my mind in the facts that she did not set the fire and the – there's nothing to change my mind.

Q.      If she swallowed pills and there was nothing about a fire in a bathtub, does that change your thinking?

A.      Yes.  If you're a firefighter – I mean, if you're doing pills on the job – you can't be on medications and fight fires or be responsible in those situations.

*** 

Q.      Is there any reason or anything you can point to to say that she has not healed and her mental status has been restored with different medications so that she can perform the duties as a driver in the fire department?

A.      I don't feel that I saw the change in the arbitration hearing.

> Q. Well, it was a grievance hearing, and, again, she was advised not to answer because we knew --
>
> A. We're talking demeanor. I said her demeanor hasn't changed to give me the confidence.
>
> Q. What is that demeanor, specifically?
>
> A. Just – you know, I hate to keep bringing up her mother, but it kept coming up. She brought it up over and over and over again, and, to me, that's still lingering, that there's still a problem.
>
> Q. What did she say?
>
> A. As other witnesses have testified, she – she brought it up forwarding that that was the day of her mother's birthday. That she was inviting friends over, was going to have a birthday party for her mother –
>
> Q. What else did she say besides her mother's birthday?
>
> A. About caring for her mother and about how nobody here knows what it's like until you've gone through it. Just constantly referring back. And that's –
>
> Q. That disqualifies her to be a firefighter because she still has concerns about her mother?
>
> A. I did not get an answer on the fire or the overdose either when I asked the question. So that was not clear in my mind.

(Def.'s Ex. 3 [19-3] at pp. 96-97.)

At the civil service hearing, Connie Cook testified as to Wolski's previous refusal to disclose mental health treatment records and the City's concern that there had been no improvement in her mental state since the December 28, 2006 fire. (Pl.'s Ex. G [23-9] at pp. 3-4.) Ms. Cook was asked to comment on the extent to which the City "would [still] want those records and have the same concerns," had Wolski merely attempted suicide by drug overdose with no accompanying fire. Cook responded:

> I think that if there were no fire, we would still have the same concerns. A firefighter on any kind of medication is always a concern for my department, as well as the fire department. We've had other incidents of firefighters on medication, and those firefighters have cooperated and produced communication with their doctors on a monthly basis. They cooperated.

(Pl.'s Ex. G [23-9] at p. 4.) Ms. Cook further explained the basis for concerns about firefighters on medication:

> [A] firefighter has to be alert. A firefighter has to be able to go from a dead sleep to complete alertness in a matter of seconds. And having had a mother who laid in a bed for 10 years and took Ativan, I have personally seen the affects [sic] of Ativan, and I don't understand how a firefighter could take some of the drugs that need to be taken by Mary and function as a firefighter.

(Pl.'s Ex. G [23-9] at p. 4.) With regard to the April 11, 2007 termination letter, which referenced the City's presumption that Wolski was an ongoing threat, Cook explained that the basis for that presumption was that Wolski was "still on medication" and, therefore, "not completely stable." (*Id.* at p. 6.)

Following three days of testimony, the Commission rendered an adverse decision on December 11, 2007, stating the following:

> Upon reviewing all the notes from the testimony, as well as the transcripts of the proceedings, the Civil Service Commission upholds the action of the City of Erie, in the matter surrounding the discharge of Ms. Mary Wolski.

> While fully recognizing the unique and painful circumstances affecting Ms. Wolski during the time in question, her admission on November 20, 2007, regarding her setting a fire at 1834 East 35th Street, is the single most significant act a fire fighter may not commit.

> The act of establishing a fire in a residence is wholly incompatible with the role of the fire fighter, despite the mitigating circumstances of Ms. Wolski's psychological state.

(Defs.' Ex. [19-1] at p. 1.)

Plaintiff appealed the Board's decision to the Erie County Court of Common Pleas on March 10, 2009 but withdrew the appeal shortly thereafter, rendering the decision of the Civil Service Commission final for purposes of state law. Wolski then unsuccessfully pursued an employment discrimination claim with the EEOC and was advised of her right to file a civil action. This action followed.

## III. **DISCUSSION**

A. <u>The Americans with Disabilities Act</u>

Title I of the ADA prohibits covered employers from discriminating against qualified individuals with disabilities because of their disabilities with regard to "terms, conditions, and privileges of employment" including, among other things, job application procedures and the hiring, advancement, or discharge of employees. See 42 U.S.C. § 12112(a). The Act defines a "qualified individual with a disability" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The term "disability" is defined as: (A) a physical or mental impairment that substantially limits one or more of the major life activities of an individual, (B) a record of such impairment, or (C) being regarded as having such impairment. See 42 U.S.C. § 12102(2). Here, Wolski claims that the City violated the provisions of the ADA by intentionally discharging her because of her perceived disability, by violating the provisions of 29 C.F.R. § 1630.2(r) pertaining to employees who pose a "direct threat" in the workplace, and/or by failing to offer her a reasonable accommodation.

*1. Collateral Estoppel*

The City's first basis for seeking a summary judgment is premised on the doctrine of collateral estoppel, otherwise known as issue preclusion. More specifically, the City argues that Wolski is collaterally estopped from contesting the decision of the civil service commission which, it claims, "determined [that Wolski's] termination resulted solely from her own offensive actions." (Br. in Supp. of Def.'s Mot. for Summ. Judg. [19] at p. 5.) In support of this argument, the City cites *Jones v. United Parcel Service*, 214 F.3d 402 (3d Cir. 2000).

*Jones*, however, does not support the application of collateral estoppel in the case at bar. In *Jones*, the plaintiff was an employee who had been injured on the job and had been receiving workers' compensation benefits. Some two years after the accident, the employer, UPS, filed a petition to terminate workers' compensation benefits on the ground that Jones had recovered from his injury. A workers' compensation judge agreed with UPS, and the matter was appealed to the Pennsylvania Workers' Compensation Appeal Board, which affirmed the termination of benefits. Jones then further appealed to the Pennsylvania Commonwealth Court, which affirmed the Appeals Board's ruling. The Pennsylvania Supreme Court subsequently denied Jones' request for further review of the matter.

In the meantime, while the state court workers' compensation litigation was still ongoing, Jones had filed a lawsuit in federal district court, claiming that UPS had violated the ADA by failing to provide him with a reasonable accommodation for his return to work. The district court granted summary judgment for UPS on the ground that Jones had failed to demonstrate that he was a qualified individual under the ADA. On

appeal, the Third Circuit affirmed the grant of summary judgment for UPS. Applying Pennsylvania's rules relative to collateral estoppel, the court of appeals ruled that Jones was precluded from contesting his full recovery from his previous work-related injury and, as a consequence, Jones could not establish that he was a "qualified individual with a disability" for purposes of the ADA. *See* 214 F.3d at 406-07.

The City contends that a similar result should obtain here because Wolski had a full and fair opportunity to litigate, before the Civil Service Commission, her bases for disputing the termination of her employment. This Court does not agree that these circumstances justify application of collateral estoppel in the case at bar.

In *Jones*, the court's analysis was premised on its application of 28 U.S.C. §1738, which states, in relevant part, that the "judicial proceedings of any court of any ... State" shall be given "the same full faith and credit in every court within the United States... as they have by law or usage in the courts of such State...from which they are taken." 28 U.S.C. §1738. *See Jones*, 214 F.3d at 406 ("We are therefore required by 28 U.S.C. §1738 to consider Jones's ADA claim in light of the irrefutable fact that as of December 1990 Jones had fully recovered from his work-related injury and was able to return to his position as a package car driver.") Section 1738, however, speaks specifically of giving full faith and credit to state court proceedings, and it therefore has application with respect to the decisions of state administrative agencies only when those decisions have been reviewed by state courts. *See Mclaughlin v. Fisher*, 277 Fed. Appx. 207, 214 (3d Cir. 2008) (Under 28 U.S.C. §1738, federal courts must give state court judgments the same preclusive effect as would courts of the rendering state, and they must also give state administrative decisions that have been reviewed by a

state court preclusive effect); *Edmundson v. Borough of Kennett Square*, 4 F.3d 186, 189 (3d Cir. 1993) ("Decisions of state administrative agencies that have been reviewed by state courts are also given preclusive effect in federal court.")  Because the decision of the workers' compensation judge in *Jones* had been litigated before the Pennsylvania Commonwealth Court – and had therefore been reduced to a state court judgment, the parties in that case conceded (as they would have had to) that the WCJ's findings should be afforded the same preclusive effect in district court as would be given by Pennsylvania courts.  That is not the situation in this case, however, because the ruling by the Civil Service Commission was not the subject of any ruling or judgment in state court.  *Jones*, therefore, is inapposite to the case at bar, and provides no basis for applying the "full faith and credit" mandate of 28 U.S.C. § 1738 in this case.

Moreover, the Supreme Court has held that unreviewed state administrative proceedings may not be given preclusive effect in Title VII cases, *see Univ. of Tenn. v. Elliott*, 478 U.S. 788, 796 (1986), or ADEA cases, *see Astoria Federal Savings & Loan v. Solimino*, 501 U.S. 104, 110-114 (1991), in light of the remedial statutory schemes established by these Acts.  Although neither the Supreme Court nor the Third Circuit has yet addressed this issue in the context of ADA cases, numerous other federal courts have extended the holdings of *Elliot* and *Astoria Federal Savings & Loan* to ADA cases, holding (or suggesting in dicta) that the ADA likewise deprives unreviewed state administrative proceedings of preclusive effect.  *See, e.g., Pernice v. City of Chicago*, 237 F.3d 783, 787 n. 5 (7th Cir.2001) (no preclusive effect given to determination by city personnel board); *Medeiros v. City of San Jose*, No. 98-16530, 1999 WL 613405 at *1 (9th Cir.1999); *Thomas v. Contoocook Valley Sch. Dist.*, 150 F.3d 31, 39 n. 5 (1st

Cir.1998); *Kosakow v. New Rochelle Radiology Assocs.*, 274 F.3d 706, 735 (2d Cir.2001) (noting in dicta that "to the extent [plaintiff's] employment discrimination claims were based on the ADA, the determination of the [New York State Division of Human Rights] would have no effect on subsequent federal litigation"); *Lomako v. New York Institute of Technology*, 2010 WL 1915041 at *6 n.7 (S.D.N.Y. May 12, 2010) (citing cases); *Milner v. Lee County, Alabama*, Civil Action No. 3:04cv919-MHT (WO), 2006 WL 1361147 at *11 (M.D. Ala. May 16, 2006) (no preclusive effect given to unreviewed findings of state unemployment compensation agency in ADA case); *Ciszewski v. Engineered Polymers Corp.*, 179 F. Supp. 2d 1072, 1087 n. 14 (D. Minn. 2001) (no preclusive effect given to findings and order from state workers' compensation administrative agency); *Russo v. Jefferson Parish Water Dept.*, No. Civ. A. 96-2134, 1998 WL 19629 at *3 (E.D. La. Jan. 16, 1998) (no preclusive effect given to decision by parish personnel board).

Based on the foregoing persuasive authority, this Court likewise concludes that no preclusive effect should be given to the unreviewed decision of the City's Civil Service Commission. Accordingly, Plaintiff is not collaterally estopped from contesting in this civil action the basis of the City's decision to terminate her employment.[4] Plaintiff's first ground for summary judgment is, accordingly, denied.

---

[4] The fact that we are not giving preclusive effect to the decision of the Civil Service Commission does not mean that the decision is altogether irrelevant to the issue of disability-related discrimination. Rather, the Commission's ruling provides evidence, presently unrebutted, that the intentional setting of a fire is just cause for the discharge of a fire fighter. In fact, it may be that the Commission's determination establishes, as a matter of conclusive fact, that the City had just cause to discharge Wolski and, thereby, the City did not violate any terms of the Pennsylvania civil service laws.

Nevertheless, whether the City violated any terms of the civil service laws is not at issue in this case, nor does the City's compliance with those laws preclude the possibility that Wolski was a victim of disability-related

*2. Evidence of Pretext*

The City alternatively moves for summary judgment on the grounds that Plaintiff cannot demonstrate the existence of a genuinely disputed issue of fact relative to pretext.

Claims of pretextual employment discrimination under the ADA follow the familiar burden-shifting paradigm outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See McNemar v. Disney Store, Inc.*, 91 F.3d 610, 619 (3d Cir. 1996), *abrogated in non-relevant part by Cleveland v. Policy Management Sys. Corp.*, 526 U.S. 795 (1999). In the initial phase, the plaintiff has the burden of establishing a prima facie case of discrimination by showing that: (1) s/he is a disabled person within the meaning of the ADA; (2) s/he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) s/he has suffered an otherwise adverse employment decision as a result of discrimination. *Gaul v. Lucent Technologies*, 134 F.3d 576, 580 (3d Cir.1998).

If the plaintiff successfully makes out a prima facie case of discrimination, the employer may nevertheless prevail by articulating a legitimate, non-discriminatory reason for the adverse employment action. *Sever v. Henderson*, 220 Fed. Appx. 159, 161 (3d Cir. Apr. 4, 2007) (*citing Salley v. Circuit City Stores, Inc.*, 160 F.3d 977, 981 (3d Cir. 1998) (citation omitted). To survive summary judgment at this stage, the

---

discrimination. At issue here is not whether the City had legal grounds (i.e., "just cause") to fire Wolski, but whether, in fact, those grounds were the *actual reasons* relied upon by the City in terminating her employment to the exclusion of other, unlawful (i.e., disability-based) reasons. To establish the City's liability under a pretext theory, Wolski will ultimately have to prove that her disability was a motivating or determinative factor in the City's decision to fire her. Unlike the City, I do not believe that the Civil Service Commission's decision constitutes conclusive evidence that the relevant decision-makers in this case – i.e., Chief Pol, Connie Cook, and Mayor Sinnott – based their decision to discharge Wolski *solely* on her past misconduct. Again, whatever evidentiary support the Commission's decision may provide in this regard, it does not conclusively settle the issue.

plaintiff must produce evidence from which a fact finder could reasonably either disbelieve the employer's articulated legitimate reasons or believe that a discriminatory reason was more likely than not a cause of the employer's action.  *Id.*

We assume for present purposes that Wolski has established a prima facie case of discrimination by showing that:  (1) she was regarded as disabled by the relevant decision-makers and therefore "disabled" within the meaning of the Act; (2) she was qualified to perform her previous job; and (3) she suffered an adverse employment action when her employment was terminated.[5]  On the basis of this record, the next phase of the McDonnell-Douglass burden shifting paradigm has been satisfied, as the City has articulated a legitimate, non-discriminatory basis for terminating Wolski, namely, the fact that she intentionally set a fire in her father's home.  Accordingly, to survive summary judgment under a pretext theory of discrimination, Wolski must adduce evidence from which a jury could reasonably:  (i) disbelieve the employer's articulated legitimate reasons or (ii) believe that a discriminatory reason was more likely than not a cause of the employer's action.  *See Sever, supra*, 220 Fed. Appx. at 161.

In support of her case, Plaintiff argues that "a jury could find that the Plaintiff was terminated for reasons other than having burned some clothes in a bathtub to create smoke, namely that the City had an unexamined and generalized fear that an employee who attempts suicide automatically poses a direct threat" to others.  (Pl.'s Mem. in Opp. to Mot. for Summ. Judg. [19] at p. 11.)  Plaintiff further argues that the City violated the

---

[5]  The City has not moved for summary judgment based on any element of Plaintiff's *prima facie* case and, therefore, we will assume for present purposes, without definitively deciding the issue, that Plaintiff can meet this initial burden of proof.

Act by failing to make an individualized assessment to determine whether she in fact

posed a direct threat to others.

Plaintiff's theory as to the City's alleged failure to engage in an "individualized

assessment" derives from a particular theory of liability under the ADA -- namely, 42

U.S.C. § 12112(6), which defines discriminatory acts under the Act to include:

> Using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity[.]

42 U.S.C. § 12112(6). Where this type of discriminatory practice is alleged, the ADA

provides an affirmative defense, as follows:

> It may be a defense to a charge of discrimination under this chapter that an alleged application of qualification standards, tests, or selection criteria that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability has been shown to be job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation, as required under this subchapter.

42 U.S.C. § 12113(a). The regulations go on to specify that "qualification standards"

refer to "the personal and professional attributes including the skill, experience,

education, physical, medical, safety and other requirements established by a covered

entity as requirements which an individual must meet in order to be eligible for the

position held or desired." 29 C.F.R. § 1630.2(q).[6]

For purposes of § 12113(a), the term "qualification standards" may include a

requirement that an individual not pose a "direct threat" to the health or safety of other

---

[6] It would appear that this affirmative defense allows the employer to disprove an element of the plaintiff's *prima* facie case by establishing that the plaintiff is not "qualified" for the job in question.

individuals in the workplace. 42 U.S.C. at § 12113(b).  *See also* 29 C.F.R. §

1630.15(b)(2).  A "direct threat" means "a significant risk of substantial harm to the

health or safety of the individual or others that cannot be eliminated or reduced by

reasonable accommodation."  *Id.* at § 1630.2(r).  Where a perceived "direct threat" is

invoked as a qualification standard, however, any determination that an individual poses

a direct threat must be based on an "individualized assessment of the individual's

present ability to safely perform the essential functions of the job."  *Id.*  Moreover, the

regulations state that such an assessment "shall be based on a reasonable medical

judgment that relies on the most current medical knowledge and/or on the best available

objective evidence."  *Id.*  In determining whether an individual would pose a direct

threat, the factors to be considered include:  (1) the duration of the risk; (2) the nature

and severity of the potential harm; (3) the likelihood that the potential harm will occur;

and (4) the imminence of the potential harm.  *Id.*

Further guidance is provided by the EEOC's enforcement handbook relative to

psychiatric disabilities, which states, in relevant part:

> Under the ADA, an employer may lawfully exclude an individual from
> employment for safety reasons only if the employer can show that employment of
> the individual would pose a "direct threat." [ ]  Employers must apply the "direct
> threat" standard uniformly and may not use safety concerns to justify exclusion of
> persons with disabilities when persons without disabilities would not be excluded
> in similar circumstances. [ ]
>
> The EEOC's ADA regulations explain that "direct threat" means "a significant risk
> of substantial harm to the health or safety of the individual or others that cannot
> be eliminated or reduced by reasonable accommodation."[ ] A "significant" risk is
> a high, and not just a slightly increased, risk.[ ]  The determination that an
> individual poses a "direct threat" must be based on an individualized assessment
> of the individual's present ability to safely perform the functions of the job,
> considering a reasonable medical judgment relying on the most current medical
> knowledge and/or the best available objective evidence.[ ]  With respect to the

employment of individuals with psychiatric disabilities, the employer must identify the specific behavior that would pose a direct threat.[ ] An individual does not pose a "direct threat" simply by virtue of having a history of psychiatric disability or being treated for a psychiatric disability.[ ]

(EEOC Enforcement Guidance on the Americans with Disabilities Act and Psychiatric

Disabilities at p. 219 ([23-1] at p. 17) (footnotes omitted).)

The EEOC's enforcement guide also speaks directly to the issue of attempted

suicide:

35. Does an individual who has attempted suicide pose a direct threat when s/he seeks to return to work?

No, in most circumstances. As with other questions of direct threat, an employer must base its determination on an individualized assessment of the person's ability to safely perform job functions when s/he returns to work. Attempting suicide does not mean that an individual poses an imminent risk of harm to him/herself when s/he returns to work. In analyzing direct threat (including the likelihood and imminence of any potential harm), the employer must seek reasonable medical judgments relying on the most current medical knowledge and/or the best available factual evidence concerning the employee.

(EEOC Enforcement Guide at Question 35, p. 220 ([23-1] at p. 18).)

In its reply brief, the City counters that there was no need for it to perform a

"direct threat" analysis in this case because Wolski was subject to termination on the

basis of her past misconduct. As the City points out, the same EEOC enforcement

guidelines referenced by Wolski state that an employer may, without violating the ADA,

discharge an employer for past misconduct which violates a workplace standard

conduct:

CONDUCT

Maintaining satisfactory conduct and performance typically is not a problem for individuals with psychiatric disabilities. Nonetheless, circumstances arise when employers need to discipline individuals with such disabilities for misconduct.

30.  May an employer discipline an individual with a disability for violating a workplace conduct standard if the misconduct resulted from a disability?

> Yes, provided that the workplace conduct standard is job-related for the position in question and is consistent with business necessity.[ ]  For example, nothing in the ADA prevents an employer from maintaining a workplace free of violence or threats of violence, or from disciplining an employee who steals or destroys property.  Thus, an employer may discipline an employee with a disability for engaging in such misconduct if it would impose the same discipline on an employee without a disability.[ ]  Other conduct standards, however, may not be job-related for the position in question and consistent with business necessity.  If they are not, imposing discipline under them could violate the ADA.

> *Example A*:  An employee steals money from his employer.  Even if he asserts that his misconduct was caused by a disability, the employer may discipline him consistent with its uniform disciplinary policies because the individual violated a conduct standard – a prohibition against employee theft – that is job-related for the position in question and consistent with business necessity. ...

(EEOC Enforcement Guide at Question 30, p. 217 ([23-1] at p. 15) (footnotes omitted).)

These same guidelines establish that employers are not required by the Act to excuse past misconduct, even where the misconduct is related to a disability:

31.  Must an employer make reasonable accommodation for an individual with a disability who violated a conduct rule that is job-related for the position in question and consistent with business necessity?

> An employer must make reasonable accommodation to enable an otherwise qualified individual with a disability to meet such a conduct standard in the future, barring undue hardship.[ ]  because reasonable accommodation is always prospective, however, an employer is not required to excuse past misconduct.[ ]

> ***

> *Example C:*  An employee has a hostile altercation with his supervisor and threatens the supervisor with physical harm.  The employer immediately terminates the individual's employment, consistent with its policy of immediately terminating the employment of anyone who threatens a supervisor.  When he learns that his employment has been terminated, the employee asks the employer to put the termination on hold and to give him a month off for treatment instead.  This is the employee's first request for accommodation and also the first time the employer learns about the

employee's disability. The employer is not required to rescind the discharge under these circumstances, because the employee violated a conduct standard – a rule prohibiting threats of physical harm against supervisors – that is job-related for the position in question and consistent with business necessity. The employer also is not required to offer reasonable accommodation for the future because this individual is no longer a qualified individual with a disability. His employment was terminated under a uniformly applied conduct standard that is job-related for the position in question and consistent with business necessity.[ ]

(EEOC Enforcement Guide at Question 31, p. 218 ([23-1] at p. 16) (footnotes omitted).)

Moreover, in a recent publication dealing more specifically with performance and conduct related standards, the EEOC has reiterated that Title I of the ADA "generally do[es] not impinge on the right of employers to define jobs and to evaluate their employees according to consistently applied standards governing performance and conduct." (Attachment 1 to Def.'s Reply Br. [25], *The Americans with Disabilities Act: Applying Performance and Conduct Standards to Employees with Disabilities* at p. 1 [25-1] at p. 1.) Under both the ADA and the Rehabilitation Act, "employees with disabilities must meet qualification standards that are job-related and consistent with business necessity and must be able to perform 'essential functions' of the position, with or without reasonable accommodation." *Id.* Thus, if an individual's disability causes or results in the violation of a work conduct rule, the employer may discipline the individual, provided that the conduct rule is job-related and consistent with business necessity and other employees are held to the same standard. (*See id.* at p. 8 ([25-1] at 2) ("The ADA does not protect employees from the consequences of violating conduct requirements even where the conduct is caused by the disability.").)

Case law supports the conclusion that, consistent with the foregoing principles, the ADA does not preclude employers from disciplining or even discharging their employees for past misconduct, even where the misconduct is the product of a disability. For example, in *Sever v. Henderson*,[7] *supra*, the plaintiff, a U.S. Postal Service employee, was fired because of inappropriate workplace behavior, namely, making threats of violence against his co-workers. The court found that there was insufficient evidence from which a fact-finder could reasonably conclude that this stated reason for the termination was pretextual. Moreover, the court noted, notwithstanding Sever's disability, his employer was entitled to hold him to certain "qualification standards," "including the requirement that an individual not pose a direct threat to the health or safety of other individuals in the workplace." 220 Fed. Appx. at 161, 2007 WL 990268 at **3. "Though an employer is prohibited from discharging an employee based on his disability, the employer is not prohibited from discharging an employee for misconduct, even if that misconduct is related to his disability." *Id.* at 161-62, 2007 WL 990268 at **3 (citing cases). Numerous other cases are in accordance with this holding. *See, e.g., Brown v. Lucky Stores, Inc.*, 246 F.3d 1182 (9th Cir. 2001) (ADA did not prevent employer from discharging employee who drove under the influence of alcohol, despite the fact that employee was an alcoholic); *Pernice v. City of Chicago*, 237 F.3d 783, 785 (7th Cir. 2001) (ADA did not prevent employer from dismissing drug-addicted employee who was arrested for possession of drugs); *Jones v. American Postal Workers Union*, 192 F.3d 417, 429 (4th Cir. 1999) (ADA is not violated when

---

[7] *Sever* involved a claim for disability-related discrimination made under the Rehabilitation Act; however, such claims are governed by the standards applicable to the Americans with Disabilities Act. *See Sever*, 220 Fed. Appx. at 161, 2007 WL 990268 at **2.

Postal Service discharges employee for on-the-job threats, even if those threats were the result of a disability); *Fullman v. Henderson*, 146 F. Supp. 2d 688, 698-99 (E.D. Pa. 2001) (employee lawfully fired for filing a false workers' compensation claim, notwithstanding his alleged disability).

For purposes of the "qualification standards" defense, it appears that the critical factor in determining whether future accommodation and/or an individualized assessment is required is whether the termination was premised upon past misconduct that violated a workplace standard or, rather, upon perceived safety or performance concerns going forward. Here, the City insists that the "individualized assessment" regulations pertaining to employees who pose a "direct threat" are inapplicable because Wolski was terminated solely on the basis of her past misconduct. However, this assertion merely begs the question whether in fact a jury would be required to find, as a matter of law, that Wolski's termination was premised solely on her own past misconduct or whether, on the contrary, a jury would be justified in finding that her termination was at least partly motivated by the City's generalized concerns relative to her perceived psychiatric disability. On this record at least, we cannot say that the record is so one-sided that a reasonable fact-finder would be precluded from finding that Wolski's perceived disability was a motivating factor in the City's decision to discharge her. Accordingly, the City's motion for summary judgment as to the ADA claim will be denied.

B.  The Pennsylvania Human Relations Act

Although they are not bound to do so, Pennsylvania courts generally interpret the PHRA in accord with its federal counterparts, among them the ADA.  Salley v. Circuit City Stores, Inc., 160 F.3d 977, 981 (3d Cir. 1998) (citing Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir.1996)). This is due in part to the substantial similarity between the definition of "handicap or disability" under the PHRA and the definition of "disability" under the ADA.  Id. (citing Fehr v. McLean Packaging Corp., 860 F. Supp. 198, 200 (E.D.Pa.1994)).  The Third Circuit has held that a claim under the PHRA is coextensive with a claim under the ADA.  Id. (citing Kelly, 94 F.3d at 105).  Accordingly, we will apply our analysis under the ADA to that claim as well.

In doing so, we conclude that this record gives rise to a genuine dispute regarding whether or not Wolski's disability was a motivating factor in the City's decision to terminate her employment.   For this reason, the Defendant's motion for summary judgment will be denied as to Wolski's claim under the PHRA.


## IV.  CONCLUSION

Based upon the foregoing reasons, the Defendant's motion for summary judgment will be denied.  An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

MARY WOLSKI, )
)
          Plaintiff, )     Case No. 1:08-cv-289-SJM
)
   v. )
)
CITY OF ERIE, )
)
          Defendant. )

## O R D E R

AND NOW, this 25th Day of February, 2011, for the reasons set forth in the

accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Motion for Summary Judgment in Behalf of

Defendant City of Erie [17] be, and hereby is, DENIED.

                                 s/    Sean J. McLaughlin

                                   SEAN J. McLAUGHLIN
                                   United States District Judge

cc: All counsel of record.