## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MARY WOLSKI,              )
                                    )
              Plaintiff,        )     Case No.  1:08-cv-289-SJM
                                    )
      v.                   )
                                    )
CITY OF ERIE,            )
                                    )
              Defendant.    )

## MEMORANDUM OPINION

McLAUGHLIN, SEAN J., District J.,

After being terminated from her job as a firefighter with the City of Erie,

Plaintiff Mary Wolski commenced this civil action under Title I of the Americans with

Disabilities Act ("ADA"), 42 U.S.C.A. § 12117(a).[1]  Following a five-day trial, a jury

found in favor of Wolski.  Presently pending before the Court is the Defendant's motion

for judgment as a matter of law and/or for a new trial.[2]  For the reasons set forth below,

the City's motion will be granted in part and denied in part.

## I.  FACTUAL BACKGROUND

Wolski was hired as the first female firefighter in the City of Erie Fire Department

in 1997.  During her tenure she performed well and gained the respect of her peers.

---

[1] Wolski also asserted a claim under related provisions of the Pennsylvania Human Relations Act ("PHRA"), Pa. Stat. Ann. tit. 43, § 951 *et seq.*  Because the legal standards governing liability and damages were essentially the same under both the ADA and the PHRA, the case was submitted to the jury only as an ADA claim.

[2] This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331.

In April 2005, Wolski's mother was diagnosed with MRSA, resulting in months of hospitalization, multiple surgeries, and ultimately a pronged and painful decline. Wolski's mother passed away on Christmas Eve, 2005 at the age of 69.

Over the course of her mother's illness, Wolski took an extensive amount of FMLA leave from her job in order to care for her mother. During this time, the City made no efforts to terminate, demote, or discipline Wolski as a result of her absences and, in fact, many of Wolski's co-workers expressed concern or support for her.

Following her mother's death, Wolski experienced feelings of personal guilt and began suffering from panic attacks. In September of 2006, she took sick leave from her job. Upon the recommendation of her primary care physician, Wolski began seeing a psychiatrist to help her cope with her grief. She developed a severe depression and began taking multiple prescription medications to address her mental health problems.

In conversations with the City's benefits coordinator, Colleen Faytek, Wolski disclosed that she was seeing a psychiatrist, was on medications and was receiving counseling. Wolski eventually agreed to return to work on a part time basis, with the intent of performing two half-days of light duty per week beginning December 12, 2006.

When December 12, 2006 arrived, however, Wolski did not report to work and the City was unable to contact her. Consequently, Fire Chief Anthony J. Pol sent his deputy, Vance Duncan, to Wolski's residence in order to check on her. Deputy Chief Duncan later generated a report of his encounter with Wolski:

> [Wolski] asked me to come in and sit down. She explained that she has been very depressed and has had some suicidal thoughts. She stated she has been going to the doctor and seeing a psychiatrist. She also stated she has begun a new medication yesterday and that the previous medications "did not work." Some medications made her "feel anxious."

She said that "the new medication may take several days until it makes her feel better." She also stated that she did not want to talk to anyone today; that is the reason she did not answer the phone when Colleen (Faytek) called earlier. She said that she has been depressed due [to] the circumstances (her mother's death last Christmas eve) and she has not been out of the house much.

I told her that we were concerned since she did not answer the phone. We wanted to make sure that she was okay. I also told her that if she needed anyone to talk to, feel free to call myself, Chief Pol, Colleen (Faytek) or [Human Resources Manager] Connie Cook.

She stated that it would probably help if she got out of the house and came back to work. She said that she has not been motivated to [do] anything.

I once again told Mary to call Colleen the next day or two and at the latest to call on Friday. I also restated that she should call either me, Chief Pol or Connie Cook also at anytime to talk.

(See Pl.'s Ex. 2.)

After leaving Wolski's house, Deputy Chief Duncan contacted Chief Pol and related the foregoing events, adding that "something needs to be done."  He was transferred to Connie Cook and left her a voicemail message, then completed the foregoing report.

On December 27, 2006, Wolski's immediate supervisor, Lt. Darren Hart, telephoned to check on Wolski in light of the fact that it was the anniversary of her mother's death.  Wolski advised Lt. Hart that she was "freaking out, but I have my family with me, so I'll be okay."

The following day, overwhelmed by severe depression and the side-effects of her medication, Wolski attempted to take her life in her father's vacant residence.[3]  She

---

[3] Wolski's father was himself receiving in-patient care at the time of this incident, which is why his house was uninhabited.

disconnected the smoke alarm, ingested an overdose of pills, and set some clothing on fire in the bathtub with the intent to commit suicide through carbon monoxide poisoning. Wolski subsequently extinguished the fire out of concern that property damage or danger to others might occur if she were to lose consciousness while the fire was still burning.  She subsequently passed out and was discovered by family members who sought emergency medical treatment.

Meanwhile, emergency fire crews arrived on scene.  Although the fire was already extinguished, the firefighters sprayed down some areas with water to ensure that any hot spots would not reignite.

Wolski was initially hospitalized in Pittsburgh, then transferred to Erie where her medications for severe depression were changed prior to her release in January 2007. She was ultimately diagnosed with severe depression – single episode.

In the wake of these events, the City of Erie police department commenced an investigation concerning possible criminal charges relating to the setting of the fire. Ultimately, the Erie County District Attorney declined to press charges.

In the meantime, however, Wolski had approached Chief Pol at a retirement party on March 6, 2007 and inquired what she had to do in order to be able to return to her job.  According to Wolski, Chief Pol replied that he did not know and suggested that the matter would have to await resolution of the pending criminal investigation.  On April 3, 2007, after Plaintiff's sick time was depleted, Chief Pol placed Wolski on paid administrative leave.

On April 11, 2007, after the DA had officially decided to forego criminal charges, Chief Pol signed a letter of termination directed to Wolski. The letter stated, in relevant part:

> The reasons for this action were referenced in my letter of April 4, 2007, placing you on paid leave pending the completion of the investigation of the December 28, 2006[ ] incident involving you. On that date, you started a fire in your residence, having disconnected the smoke detectors and carbon monoxide detectors, and took an overdose of medication as a suicide attempt. Family members extinguished the fire, but the City firefighting crew was dispatched to your home; and you were taken by helicopter to Pittsburgh for emergency medical treatment to save your life.

> This incident renders you presumptively unsuited to be a firefighter, as you pose an ongoing threat to the safety of the public, other firefighters and yourself, having set a fire in a residence.....

Aside from Chief Pol, those having input into the decision to terminate Wolski's employment included the City's Human Resources Director, Connie Cook, and the Mayor of the City of Erie.

After being terminated from her job, Wolski unsuccessfully pursued a grievance procedure pursuant to her collective bargaining agreement. At some point after June 26, 2007, Wolski submitted to the City, for the first time, a letter from Lance Besner, M.D, a treating psychiatrist. This letter, dated June 26, 2007, consisted of one sentence indicating that Wolski had been medically cleared to return to work as of March 15, 2007.

Wolski subsequently submitted another letter from Dr. Besner dated August 6, 2007 which purported to summarize Wolski's mental status, both past and present, as well as her medication trials. This letter was received by the City on August 28, 2007.

Two days later, hearings commenced before the City's Civil Service Commission relative to Wolski's appeal from her unsuccessful grievance procedure.  During these hearings, the Civil Service Commission heard testimony from Chief Pol and Connie Cook, among others, concerning the circumstances surrounding Wolski's termination.  Following three days of testimony, the Commission rendered an adverse decision on December 11, 2007, stating the following:

> Upon reviewing all the notes from the testimony, as well as the transcripts of the proceedings, the Civil Service Commission upholds the action of the City of Erie, in the matter surrounding the discharge of Ms. Mary Wolski.

> While fully recognizing the unique and painful circumstances affecting Ms. Wolski during the time in question, her admission on November 20, 2007, regarding her setting a fire at 1834 East 35th Street, is the single most significant act a fire fighter may not commit.

> The act of establishing a fire in a residence is wholly incompatible with the role of the fire fighter, despite the mitigating circumstances of Ms. Wolski's psychological state.

(Defs.' Ex J.)  The Commission's decision became final for purposes of state law after Wolski withdrew her appeal to the Erie County Court of Common Pleas on March 10, 2009.

## II.    LEGAL BACKGROUND

Title I of the ADA prohibits covered employers from discriminating against qualified individuals with disabilities because of their disabilities with regard to "terms, conditions, and privileges of employment" including, among other things, job application procedures and the hiring, advancement, or discharge of employees.  See 42 U.S.C. §12112(a).  The statute defines prohibited acts of discrimination to include the use of employment "qualification standards … that screen out or tend to screen out an

individual with a disability or a class of individuals with disabilities" unless the employer shows that the standard being invoked is "job-related for the position in question and is consistent with business necessity."  42 U.S.C. §12112(6).   Valid job "qualification standards" may include a requirement that an individual not pose a "direct threat" to the health or safety of other individuals in the workplace, 42 U.S.C. at § 12113(b); 29 C.F.R. § 1630.15(b)(2), which is understood as "a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation."  29 C.F.R. at § 1630.2(r).

Where a perceived "direct threat" is invoked as a job qualification standard, however, the employer's determination of "direct threat" must be based on an "individualized assessment of the individual's present ability to safely perform the essential functions of the job."  29 C.F.R. at § 1630.2(r).  Such an assessment must, in turn, be based on "a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence."  *Id*.  In determining whether an individual would pose a direct threat, the factors to be considered include: (1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that the potential harm will occur; and (4) the imminence of the potential harm. *Id*.

Further guidance is provided by the EEOC's enforcement handbook relative to psychiatric disabilities:

> Under the ADA, an employer may lawfully exclude an individual from employment for safety reasons only if the employer can show that employment of the individual would pose a "direct threat." [ ]  Employers must apply the "direct threat" standard uniformly and may not use safety

concerns to justify exclusion of persons with disabilities when persons without disabilities would not be excluded in similar circumstances. [ ]

*** 

… With respect to the employment of individuals with psychiatric disabilities, the employer must identify the specific behavior that would pose a direct threat.[ ]  An individual does not pose a "direct threat" simply by virtue of having a history of psychiatric disability or being treated for a psychiatric disability.[ ]

(EEOC Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities (Pl.'s Ex. 6) at p. 219 (footnotes omitted).)

The enforcement handbook also speaks directly to the issue of attempted suicide:

35.  Does an individual who has attempted suicide pose a direct threat when s/he seeks to return to work?

No, in most circumstances.  As with other questions of direct threat, an employer must base its determination on an individualized assessment of the person's ability to safely perform job functions when s/he returns to work.  Attempting suicide does not mean that an individual poses an imminent risk of harm to him/herself when s/he returns to work.  In analyzing direct threat (including the likelihood and imminence of any potential harm), the employer must seek reasonable medical judgments relying on the most current medical knowledge and/or the best available factual evidence concerning the employee.

(Id. at Question 35, p. 220.)

## III.    **PROCEDURAL BACKGROUND**

Wolski commenced this suit on October 20, 2008, claiming that she was intentionally discharged by the City on account of disability in violation of the ADA. More specifically, Wolski contends that the City terminated her because it believed that she posed a direct threat to the health and safety of others in her workplace.  Wolski avers that the City violated the ADA by failing to comply with the Act's regulatory

scheme inasmuch as it failed to conduct an individualized assessment based on objective criteria in determining that she posed a "direct threat" to the workplace and instead based its threat assessment on subjective perceptions, irrational fears, stereotypes and patronizing attitudes.

In defending this case, the City has denied that Wolski was terminated because of a concern that she posed a "direct threat" to others in her workplace.  Rather, the City has asserted that Wolski was discharged solely for her act of intentionally setting a fire in her father's home.  Thus, the City reasons, there was no need for it to perform a "direct threat" analysis in this case because Wolski was subject to termination only on the basis of her past misconduct.

On June 8, 2010, the City filed its motion for summary judgment arguing, among other things, that no genuinely disputed issue existed as to whether the City's proffered reason for Wolski's termination was a pretext for disability-related discrimination. Because the case had been litigated to that point as one of alleged pretextual employment discrimination, we analyzed Plaintiff's evidence under the familiar burden-shifting paradigm outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Based largely on testimony that had been proffered by Chief Pol and Ms. Cook both at the proceedings before the Civil Service Commission and at depositions for this case, this Court found that a genuine dispute existed in the record concerning the issue of pretext.  *See generally Wolski v. City of Erie*, 773 F. Supp. 2d 577, 587-92 (W.D. Pa. 2011).  In addressing the question of pretext in light of Plaintiff's theory that she was terminated because of an unsupported, generalized fear that she posed a "direct threat" to her workplace, we stated the following:

For purposes of the "qualification standards" defense, it appears that the critical factor in determining whether future accommodation and/or an individualized assessment is required is whether the termination was premised upon past misconduct that violated a workplace standard or, rather, upon perceived safety or performance concerns going forward. Here, the City insists that the "individualized assessment" regulations pertaining to employees who pose a "direct threat" are inapplicable because Wolski was terminated solely on the basis of her past misconduct. However, this assertion merely begs the question whether in fact a jury would be required to find, as a matter of law, that Wolski's termination was premised solely on her own past misconduct or whether, on the contrary, a jury would be justified in finding that her termination was at least partly motivated by the City's generalized concerns relative to her perceived psychiatric disability. On this record at least, we cannot say that the record is so one-sided that a reasonable fact-finder would be precluded from finding that Wolski's perceived disability was a motivating factor in the City's decision to discharge her. Accordingly, the City's motion for summary judgment as to the ADA claim will be denied.

773 F. Supp. 2d at 592.

At trial, the City once again took the position that the "individualized assessment" regulations pertaining to employees who pose a "direct threat" are inapplicable because Wolski was terminated solely on the basis of her past misconduct. Moreover, the City challenged Plaintiff's ability to establish that she was a "disabled" individual within the meaning of the Act. Specifically, at the close of Wolski's case in chief, the City moved for judgment as a matter of law under rule 50(a) on the ground that Wolski had not shown that she was "regarded as" disabled by the City and had not proffered sufficient evidence to rebut the City's proffered explanation for her discharge.

This Court denied the City's Rule 50(a) motion and submitted the case to the jury as a mixed-motives case because, on further consideration of the issue, we found sufficiently direct evidence of discriminatory animus to invoke the analysis set forth in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 244-45 (1989), as discussed by our Court

of Appeals in *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089 (3d Cir. 1995).  The

jury ultimately returned a verdict in favor of Wolski, and the City filed its pending motions

for judgment notwithstanding the verdict and/or a new trial.

## IV.  STANDARD OF REVIEW

Rule 50(a)(1) of the Federal Rules of Civil Procedure authorizes the entry of

judgment as a matter of law according to the following standard:

> **(1) In General**.  If a party has been fully heard on an issue during a jury
> trial and the court finds that a reasonable jury would not have a legally
> sufficient evidentiary basis to find for the party on that issue, the court
> may:
>> **(A)** resolve the issue against the party; and
>>
>> **(B)** grant a motion for judgment as a matter of law against the party
>> on a claim or defense that, under the controlling law, can be
>> maintained or defeated only with a favorable finding on that issue.

Fed.R.Civ.P. 50(a)(1).  A motion for relief under Rule 50(a) may be made at any time

before the case is submitted to the jury.  Fed.R.Civ.P. 50(a)(2).

Where, as here, the court does not grant the Rule 50(a) motion, "the court is

considered to have submitted the action to the jury subject to the court's later deciding

the legal questions raised by the motion."  Fed.R.Civ.P. 50(b).  In the event an adverse

judgment is entered, the movant may, within 28 days thereafter, renew the motion for

judgment as a matter of law.  *Id.*  In ruling upon a renewed motion, the court may do any

of the following:

(1) allow judgment on the verdict, if the jury returned a verdict;

(2) order a new trial; or

(3) direct the entry of judgment as a matter of law.

Fed. R. Civ. P. 50(b).

In deciding the Defendant's Rule 50(b) motion, the Court must view the evidence in the light most favorable to the prevailing, non-moving party— to wit, the Plaintiff, giving her the benefit of every fair and reasonable inference.  *Toledo Mack Sales & Service, Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 209 (3d Cir.2008).  *See also*, *Davis v. Berks County Philadelphia,* 351 Fed. Appx. 640, 643 (3d Cir. 2009) ("A district court should grant a motion for judgment as a matter of law only if, 'viewing the evidence in the light most favorable to the nonmovant and giving [him] the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability.") (citing *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir.1993))(alteration in the original).

Rule 59 permits the trial court, on motion, to "grant a new trial on all or some of the issues – and to any party – as follows:  **(A)** after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).

## V.   DISCUSSION

To establish a *prima* facie case of disability-related discrimination, Wolski was required to show that she (1) is disabled, (2) is otherwise qualified to perform the essential functions of the job in question, with or without reasonable accommodations by the employer, and (3) has suffered an adverse employment action as a result of her disability.  *Hohider v. United Parcel Service, Inc.*, 574 F.3d 169, 186 (3d Cir.2009) (citation omitted); *Turner v. Hershey Chocolate, U.S.*, 440 F.3d 604, 611 (3d Cir. 2006).  The term "disability" is statutorily defined to mean:  (A) a physical or mental impairment that substantially limits one or more of the major life activities of an individual, (B) a record of such impairment, or (C) being regarded as having such impairment.  *See* 42 U.S.C. §12102(2).

At trial, Wolski attempted to establish the prima facie element of "disability" by arguing that (a) she was regarded as disabled by the relevant decision-makers and/or (b) she had a record of a "disability" within the meaning of the Act.[4]  The City now moves for judgment as a matter of law on the grounds that Wolski failed to submit evidence sufficient to satisfy either definition of disability.

### A.  Record of Disability

The City contends that the evidence introduced at trial was insufficient to support a finding that Wolski has a "record" of a disability.  Specifically, the City alleges that Wolski "failed to adduce evidence that the City utilized a record of Wolski's impairment as a reason for an adverse employment action, as the term record of impairment is used in 29 C.F.R. §1630.2(k) (2007)."  (Def.'s Post Trial Motions [50] at p. 1.)  Moreover, the City claims, Wolski "failed to introduce evidence as to how the City considered her impairment as substantially limiting one or more major life activities taking into account the nature and extent of her condition."  (Id. at p. 2.)  The City further argues that Wolski "failed to adduce evidence that the City had knowledge of or misclassified her as suffering from a permanent or long term mental condition when it took an adverse employment action against her, or had any material objective knowledge of the severity or durational aspects of the impairment such as to constitute a record of impairment."  (Id. at p. 2.)

---

[4] There was no dispute by the City that Wolski was otherwise qualified for the job of firefighter and suffered an adverse employment decision.  Thus, the only aspect of Wolski's *prima facie* case which was litigated at trial was the issue as to whether she established that she had a "disability" within the meaning of the Act.

Wolski contends that the City's challenges relative to record of disability have been waived because they were not raised in the City's Rule 50(a) motion during trial. Rule 50(a)(2) provides that a motion for judgment as a matter of law may be made at any time before the case is submitted to the jury, and that such a motion, if made, "must specify the judgment sought and the law and facts that entitled the movant to the judgment." Fed. R. Civ. P. 50(a)(2). Normally, "a defendant's failure to raise an issue in a Rule 50(a)(2) motion with sufficient specificity to put the plaintiffs on notice waives the defendant's right to raise the issue in their Rule 50(b) motion." *Williams v. Runyon,* 130 F.3d 568, 571-72 (3d Cir. 1997) (citing authority). *See also Chainey v. Street,* 523 F.3d 200, 218 (3d Cir. 2008); *Noble Biomaterials v. Argentum Medical, LLC,* Civil Action No. 3:08-CV-1305, 2011 WL 4458796 at *3 (M.D. Pa. Sept. 23, 2011); *Reynolds v. University of Pennsylvania,* 747 F. Supp. 2d 522, 540-41 (E.D. Pa. 2010); *Cipriani v. Lycoming County Housing Authority,* 177 F. Supp. 2d 303, 314 (M.D. Pa. 2001). "In assessing whether a motion for judgment as a matter of law brought under Rule 50(a)(2) is sufficiently specific, the court should consider not only the text of the motion, but also 'the background,' as reflected in the record, of what the party now claiming waiver understood as the tenor of the Rule 50 movant's position and theory." *CIF Licensing, LLC v. Agere Systems Inc.,* 727 F. Supp. 2d 337, 354 (D. Del. 2010) (quoting *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,* 140 F.3d 494 519 n.18 (3d Cir. 1998)).

We agree that the City's Rule 50 challenges to Wolski's "record of disability" theory are waived because they were not specifically raised prior to submission of the case to the jury. During the argument which was held relative to the City's Rule 50(a)

motion, the City clearly challenged the sufficiency of Wolski's proof as it related to the issues of "regarded as" disability and pretext.  The following discussion then ensued:

> THE COURT:  All right.  Let me ask you a couple of questions, then I'll hear from Mr. Susko.  On this record isn't it uncontroverted that she had a record of an impairment?
>
> MR. VILLELLA:  She had a record of an impairment for --- yeah, temporary impairment –
>
> THE COURT:  She had a record of disability on this record, didn't she?
>
> Mr. VILLELLA:  She had a record of something that prevented her from going to work certainly – yes, she could be disabled temporarily for the time that she wasn't coming into work, she was off on sick leave.
>
> THE COURT:  Let me ask the question more clearly.  On this record doesn't the record here, not suggest but establish, that she had a record of mental disability of which this employer was aware?
>
> MR. VILLELLA:  Yes.  We were aware that she had a mental disability –
>
> THE COURT:  Why does she even need, although she can pursue it, but why does she even need to pursue regarded as; that's an independent basis for establishing a prima facie case, isn't it?
>
> MR. VILLELLA:  It may well be.  If there is a record and that's not tied into the regarded as.  If she was regarded as at the time she was terminated, as she's saying, that's what she's zeroing in on, when the termination letter was sent.
>
> THE COURT:  But if there's a record independently of the question of regarded as, she's satisfied that element of a prima facie case, hasn't she?
>
> MR. VILLELLA:  If that's what the case law would say on that issue – I mean you're saying he's asserting both –
>
> THE COURT:  Apparently it's pled both ways.
>
> MR. VILLELLA:  If you're saying that is sufficient to distinguish that –
>
> THE COURT:  I'm not saying that, I'm asking you?
>
> MR. VILLELLA:  Right.  Then you have to move on to the issue of whether she's got enough to support pretext.

(Tr. of Rule 50 Arg., Ex. A to Pl.'s Resp. to Def.'s Post-Trial Mot. [58-1] at pp. 4-5.)

As defense counsel correctly notes, the foregoing discussion arose in the context of this Court's attempt to ascertain whether the City was conceding Wolski's establishment of a record of disability, since that would have mooted the City's

challenge to Wolski's "regarded as" theory.  Although defense counsel did not

unequivocally concede the issue, and although he vaguely alluded to Plaintiff's leave of

absence as "temporary," he did not specifically frame his Rule 50(a) motion to include

Wolski's "record of disability" theory.

A similar discussion occurred during oral argument concerning the parties'

proposed points for charge, when the Court questioned counsel as to whether there

was any dispute that Wolski had a record of disability within the meaning of the Act.

The purpose of the discussion was to determine whether the jury needed to be

instructed on the issue of "disability" or whether that prima facie element had been

conclusively established.  Defense counsel did not concede that a record of disability

had been established as a matter of law, but he did admit to some uncertainty about the

issue.  Ultimately, defense counsel appeared to treat the matter as a factual issue to be

argued to the jury, and an instruction as to the temporal durational requirements of

disability was incorporated into the charge.

We also consider the fact that, even though the complaint pled disability under

both "regarded as" and "record of" theories, the City in its trial brief did not raise any

purported deficiencies in Wolski's "record of disability" theory.  Rather, the City focused

exclusively on perceived defects in Wolski's "regarded as" theory and the lack of any

fellow employees that could serve as comparators.  Neither argument concerned the

alleged temporariness of Wolski's mental impairment.

In addition, we consider the City's original Rule 50(b) motion (styled a "Motion for

Judgment as a Matter of Law in Behalf of Defendant City of Erie" [47]), which was filed

the day after the jury rendered its verdict.  In this motion, the City identified two issues

that it believed warranted judgment notwithstanding the verdict:  Wolski's alleged failure

to establish that she was "regarded as disabled" and Wolski's failure to establish that

the City's proffered explanation for her termination was a pretext for disability

discrimination.  No mention was made concerning the element of disability under a

"record" theory.

Given the overall context in which the discussion of Wolski's record of disability

occurred in this trial, I find that the issue was not raised at the Rule 50(a) stage with

sufficient specificity.  Accordingly, the issue is deemed waived for purposes of the

pending Rule 50(b) motion.

### B.  Regarded as Disabled

The City also contends that Wolski failed to adduce evidence that she was

"regarded as" disabled within the meaning of the Act.  A person is "regarded as" having

a disability if she:

> (1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by the covered entity as constituting such limitation;
>
> (2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or
>
> (3) Has [no such impairment] but is treated by a covered entity as having a substantially limiting impairment.

*Hershgordon v. Pathmark Stores, Inc.*, 285 Fed. Appx. 846, 848 (3d Cir. 2008) (*quoting*

*Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 187 (3d Cir.1999)).

If a plaintiff is attempting to establish that the employer believed her to be

substantially limited in the life activity of "working," then the plaintiff must establish that

the employer believed her to be limited in her ability to work in "either a class of jobs or

a broad range of jobs in various classes as compared to the average person having

comparable training, skills, and abilities." *See Hershgordon,* 285 Fed. Appx. at 848

(quoting *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 491 (1999)); *Tice v. Centre Area*

*Transp. Authority,* 247 F.3d 506, 514 (3d Cir. 2001) (citing authority).  See also 29

C.F.R. §1630.2(j)(3)(i) (2008) (stating that an individual is "substantially limited" with

regard to working if there is a significant restriction in a person's "ability to perform either

a class of jobs or a broad range of jobs in various classes as compared to the average

person having comparable training, skills and abilities.").  "Stated differently, "to be

regarded as substantially limited in the major life activity of working, one must be

regarded as precluded from more than a particular job." *Hershgordon, supra,* at 848

(*quoting Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516, 523 (1999)).  *See also* 29

C.F.R. §1630.2(j)(3)(i) ("The inability to perform a single, particular job does not

constitute a substantial limitation in the major life activity of working."); *Taylor*, 177 F.3d

at 192 ("An employer who simply, and erroneously, believes that a person is incapable

of performing a particular job will not be liable under the ADA.  Liability attaches only to

a mistake that causes the employer to perceive the employee as disabled within the

meaning of the ADA, i.e., a mistake that leads the employer to think that the employee

is substantially limited in a major life activity.").[5]

---

[5] It should be noted that the ADA Amendments Act of 2008 (P.L. 110-325, 122 Stat. 3555) (the "2008 Amendments") made numerous changes to the ADA's definition of "disability" so as, in part, to overrule the Supreme Court's decision in *Sutton v. United Air Lines, Inc.,* 527 U.S. 471 (1999), which, it was felt, had unduly narrowed the scope of protection intended to be afforded by the Act.  Most relevantly, the 2008 Amendments make clear that "working" is a "major life activity," and they eliminate any requirement that the plaintiff prove an inability to perform a broad range of jobs.  Thus, under the current form of the law, "[a] plaintiff meets the requirement of being 'regarded as' disabled if she establishes that she has been discriminated against 'because of an actual or perceived impairment *whether or not the impairment limits or is perceived to limit a major life activity*.'"  Section 4 of the ADA Amendments Act of 2008 (emphasis added).

The City contends that Wolski failed to produce evidence sufficient for a jury to find that she was regarded as being precluded from either a class of jobs or a broad range of jobs in various classes.  According to the City, Wolski produced, at most, evidence suggesting that she was viewed as unable to perform the job of firefighter, a single job.

The City's objection is well-taken.  The evidence at trial was sufficient to support a reasonable inference that the City's decision-makers regarded Wolski as incapable of performing the job of firefighter by reason of her mental impairment.  However, numerous federal court decisions have held that the job of firefighter does not constitute a "class of jobs" or a "broad range of jobs in various classes" for purposes of establishing a "substantial limitation" in the major life activity of "working."  *See, e.g. Shipley v. City of University City,* 195 F.3d 1020, 1023 (8th Cir. 2000) (plaintiff's ADA claim was legally insufficient where he failed to produce evidence that he was regarded as unable to perform other jobs besides that of firefighter) (citing *Smith v. City of Des Moines, Iowa,* 99 F.3d 1466 (8th Cir. 1996)); *Bridges v. Bossier,* 92 F.3d 329, 335 (5th Cir. 1996) ("firefighters alone do not constitute a 'class of jobs'") (following *Welsh v. City of Tulsa, Oklahoma,* 977 F.2d 1415, 1416-1420 (10th Cir. 1992) (Rehabilitation Act case)); *Green v. New York City Fire Department,* No. 08 Civ. 0491 (BMC), 2008 WL 5377959 at *9 (E.D.N.Y. Dec. 23, 2008) (finding that "[t]he firefighter position, as utilized by the FDNY, is similarly a single job"); *Parker v. City of Williamsport,* 406 F. Supp. 2d

---

The 2008 Amendments were effective as of January 1, 2009.  *See id.* at § 8.  It is well established among the various courts of appeals that the Amendments are not retroactive to cases pending prior to their effective date.  *See Weidow v. Scranton School Dist.,* 460 Fed. Appx. 181, 185 n. 7 (3d Cir. 2012) (observing that "[e]very Court of Appeals to consider the issue has held that the ADAAA does not have retroactive effect" and agreeing with those decisions) (citing authority). Thus, we apply the law of this circuit as it existed prior to the 2008 Amendments.

534, 546-47 (M.D. Pa. 2005) (terminated firefighter failed to show substantial limitation in major life activity of working where he failed to submit evidence of his work-related abilities and qualifications, the jobs available in his geographic area, the number of jobs utilizing his particular abilities and the number of those jobs from which he is disqualified due to his impairments, or the number of jobs that do not utilize his particular abilities and the number of those jobs from which he is disqualified due to his impairments) (citing 29 C.F.R. § 1630.2(j)(3)(ii)(A)-(C)); *Taraila v. City of Wilmington,* No. CIV. A. 99-564-GMS, 2000 WL 1708218 at *4 (D. Del. Oct. 12, 2000) ("An impairment preventing someone from being a firefighter is not substantial limitation on a 'class' or 'range' of jobs.") (citing authority); *Serrano v. County of Arlington,* 986 F. Supp. 992, 998-99 (E.D. Va. 1999) (County did not regard plaintiff as unable to perform a "class of jobs or broad range of jobs in various classes"; rather, they perceived him as being precluded only from the position of firefighter and, therefore, did not regard plaintiff as disabled within the meaning of the ADA). *But see Haynes v. City of Montgomery, Alabama,* 344 Fed. Appx. 519, 520 (11th Cir. 2009) (finding sufficient evidence to establish that city perceived firefighter as substantially limited from performing a broad range of jobs where, among other things, notes and testimony from city's medical expert established that doctor would not have cleared firefighter to work in any safety-sensitive position or drive a vehicle of any kind, including a fire truck).

Wolski attempted to rebut this alleged deficiency at trial by pointing to testimony on the part of Connie Cook wherein Ms. Cook essentially admitted that she regarded Wolski as being "disabled." However, this argument becomes somewhat circular because "regarded as" disability depends upon a showing that the plaintiff was regarded

by the employer as disabled within the meaning of the ADA, which in turn depends upon a showing that the plaintiff was regarded as somehow being substantially limited in a major life activity – here, working.  See *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 489 (1999) ("There are two apparent ways in which individuals may fall within this statutory definition [of "regarded as" disability]:   (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities.  In both cases, it is necessary that a covered entity entertain misperceptions about the individual—it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting.").[6]

Here, the record is devoid of any evidence establishing that Chief Pol and/or Ms. Cook regarded Wolski as unable to perform other jobs besides that of firefighter. Moreover, the testimony at trial established that the vast majority of positions within the Erie Bureau of Fire were firefighter positions and only a handful of non-firefighter jobs existed within the Bureau.  Thus, there is insufficient evidence to support a finding that various classes of jobs existed within the Bureau of Fire.  Accordingly, the City was entitled to a finding, as a matter of law, that Wolski could not establish that she was "regarded as" disabled.  In order to ascertain the legal implications of this error,

---

[6] In addition, it would seem that Ms. Cook's testimony concerning "regarded as" disability involves a legal conclusion, as to which parties cannot make legally binding admissions.

however, as well as the appropriate remedy, we must consider the City's remaining post-trial challenges.

   *C. Failure to Rebut Pretext/ Mixed-Motives Charge*

   The City's remaining arguments in favor of post-trial relief are two-fold but will be addressed together.  First, the City contends that Wolski failed to produce evidence sufficient to rebut the City's proffered reason for her termination (namely, the intentional setting of a fire) and to support an inference of pretextual disability discrimination.  The City maintains that this failure of proof entitles it to judgment as a matter of law.

   Second, and relatedly, the City contends that this Court erred in instructing the jury on mixed-motives as opposed to submitting the case to the jury on a pretext theory. The City maintains that this alleged error by the Court entitles it to a new trial.

   Addressing the second point first, I conclude that there was no error in submitting this case to the jury on a mixed-motives/ *Price Waterhouse*[7] theory.  In *Starceski v. Westinghouse Electric Corp.,* 54 F.3d 1089 (3d Cir. 1995), the Third Circuit Court of Appeals discussed the type of evidence that would warrant a *Price Waterhouse* instruction.  Quoting *Griffiths v. CIGNA Corp.,* 988 F.2d 457 (3d Cir. 1993), the court noted that "a charge on a 'mixed-motives' theory of employment discrimination requires 'conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude."  54 F.3d at 1096 (quoting *Griffiths*, 988 F.2d at 470).  Further, quoting *Armbruster v. Unisys Corp.,* 32 F.3d 768 (3d Cir. 1994), the court observed that:

---

[7] *See Price Waterhouse v. Hopkins,* 490 U.S. 228 (1989).

> [I]n a [mixed-motives] case unaffected by the Civil Rights Act of 1991, the
> evidence the plaintiff produces *is so revealing of discriminatory animus*
> *that it is not necessary to rely on any presumption from the prima facie*
> *case* [as is necessary in a pretext action] to shift the burden of production.
> Both the burden of production and the risk of non-persuasion are shifted to
> the defendant who … must persuade the factfinder that[,] even if
> discrimination was a motivating factor in the adverse employment
> decision, it would have made the same employment decision regardless of
> its discriminatory animus.

54 F.3d at 1096 (quoting *Armbruster,* 32 F.3d at 778 (alterations and emphasis in the

original).  Finally, quoting from Justice O'Connor's concurring opinion in *Price*

*Waterhouse,* the court of appeals recalled that stray remarks in the workplace,

statements by nondecisionmakers, or statements by decisionmakers that are unrelated

to the decisional process itself will not suffice as grounds to shift the burden of

persuasion onto the employer. Id. (quoting *Price Waterhouse v. Hopkins,* 490 U.S. 228,

277 (1989)).  Rather, "[w]hat is required is … *direct evidence that decisonmakers placed*

*substantial negative reliance on an illegitimate criterion in reaching their decision.*" *Id.*

(quoting *Price Waterhouse, supra*, at 277) (ellipsis and emphasis in the original).

In this case, there was evidence at trial in the form of statements by the City's

decision-makers which, if construed in the light most favorable to Wolski, could be

interpreted as reflecting a direct discriminatory animus sufficient to warrant the burden-

shifting paradigm of *Price Waterhouse.*  Chiefly, this came in the form of testimony from

Chief Pol and Connie Cook which had been offered at Wolski's hearing before the Civil

Service Commission and/or at depositions in this civil action.

For example, at Wolski's civil service hearing, Connie Cook was questioned

hypothetically as to whether the City would have had concerns about Wolski's mental

status if she had attempted suicide by a different method not involving the setting of a

fire.  Cook's response was, "I think that if there were no fire, we would still have the same concerns.  A firefighter on any kind of medication is always a concern for my department, as well as the fire department."  When asked if that was "part of the reason why you object to [Wolski] returning [to work]" – i.e., "because you perceive her or regard her as having a disability because of her mental status," Cook responded, "I would have to say yes."

At her deposition taken in connection with this case, Ms. Cook was asked whether "it would be fair to say that there was sort of a generalized fear that there could be a relapse of Mary's mental illness," to which she replied, "Yes."  The question was posed, "[Y]ou didn't know when or you didn't know how, but there was a generalized fear that this can occur sometime in the future again?"  Ms. Cook again responded, "Yes."  When asked during trial about the basis for the City's generalized fear that Wolski's severe depression might recur, Ms. Cook explained, "[W]e didn't have enough information about her condition, so you always fear the unknown."  Ms. Cook acknowledged having testified at deposition that, once she knew about Wolski's depression and suicide attempt, nothing could change her mind about Wolski being an ongoing threat.  She further acknowledged her prior testimony to the effect that, once the onset of depression came, the City's assumption was that it would be with her for the rest of her life.  Asked at trial, "You also believed that there was no guarantee that some type of depression episode or attempted suicide would not reoccur in the future," Ms. Cook replied, "That's correct."

Ms. Cook was also questioned at trial about concerns she had relative to Wolski's medication regimen.  The following exchange occurred:

Q.  Part of your thinking was that even though you didn't have records or reports or a list of Mary's medication at the time of her termination, you had some personal experience with your mother taking Ativan, according to your previous testimony?

A.  Yes.

Q.  And you believe you thought that your mother was lethargic?

A.  Yes.

Q.  That's why you had some problems with Mary returning because if a firefighter was taking Ativan, he or she could be lethargic like your mother?

A.  I saw the affects [sic] of the drug on my mother and I didn't understand how a person could take that drug and be a firefighter.

Q.  … you didn't even know that Mary was taking Ativan before the termination, correct?

A.  I don't think so.

Q.  But even if you did, you don't know what the dosages were, do you?

A.  No.

Q.  You don't know how it affects people at different age groups, do you?

A.  No.

Q.  You don't know how it affects people taking one a day or several a day or what the drug regiment was, do you?

A.  No.

Ms. Cook also read into the trial record testimony from her deposition wherein she had raised the rhetorical questions:  "What if this happens again.  What if her medications change and we don't know about it.  What if she becomes unstable and [is as] calculating about killing herself as she was the last time.  And what if she drives the

fire truck into the side of a building and kills the whole crew."  Asked at deposition

whether she "raise[d] those what if questions at that time as far as arriving at the

presumption that [Wolski] posed an ongoing threat," Cook replied, "Yes, we did discuss

it."  When asked at deposition what the reason was for concluding that the City could

not continue to employ Mary as a firefighter, Cook had responded, "We felt that she

posed an ongoing risk for the safety of firefighters, citizens."  Cook also read into the

trial record her explanation at deposition as to why there was confusion about Wolski's

possible ongoing risk to firefighters and citizens – to wit:  "We had no guarantee that

there wouldn't be another episode of depression.  We had no guarantee that her

medication might alter her mental status, her demeanor."

During trial, Chief Pol was questioned about statements he had made before the

Civil Service Commission relative to Wolski's post-termination hearing.  When asked at

that hearing "what about her mother's death [ ] might cause a lingering problem for

[Wolski] that could flare-up into a similar event into the future," Chief Pol responded:

> Because of the dates of the incident coinciding with her mother's funeral,
> the one-year anniversary, you know, I have concerns in the future what's
> going to happen next year.... I have no proof or anything that I can
> endanger [sic] — being on medication, driving a fire truck — my job is to
> protect the firefighters, all of them.  And I can't believe — I can't sit here
> and say that I want — I can have her back driving a fire truck and fighting
> fires and endanger other people.  My job is to the firefighter first and to the
> citizen second.
>
> ...
>
> I just have concerns about the feedback I'm getting from other firefighters
> about her coming to work and the trust they have.  Firefighting is a very
> close business, somebody has to have your back, somebody has to drive
> you there safely and get you there safely, and there's concerns.  And
> that's the feedback I'm getting.  And as Chief, that's what I'm saying today,
> nothing has changed my mind to say that she should come back to work.

(Pl.'s Ex. 14.)

The jury was also informed of Chief Pol's admission at deposition that he had had concerns about Wolski driving while on medications.  When asked if events would have played out any differently had Wolski supplied her psychiatrist's report to the City prior to being placed on administrative leave, Chief Pol suggested in his deposition testimony that such information may have given rise to an evaluation process.  Further, Chief Pol admitted at trial that the fire and Wolski's medications were considerations that were discussed in connection with Wolski's termination.

In light of the foregoing testimony, the case was properly submitted to the jury on a mixed-motives/ *Price Waterhouse* instruction.  Both Ms. Cook and Chief Pol contributed to the decision-making process and both had made statements which could be viewed as directly evidencing a discriminatory bias in the form of a generalized fear about Wolski's mental state, formed without the benefit of any objective medical or psychological evidence.  Thus, there was no error involved in charging this case to the jury under a mixed-motives theory.

Based largely on the same evidence, I find that the evidence was easily sufficient to rebut the City's proffered explanation for Wolski's termination, even if the case had been submitted to the jury under a pretext theory with Wolski bearing the burden of persuasion.  The City nevertheless contends that this Court erred in "fail[ing] to recognize the magnitude of Wolski's misconduct and its impact upon the City in evaluating her claim of discrimination under the ADA, as requested in the City's Requested Points for Charge at number seven," which read as follows:

You should consider the nature of Plaintiff's action of setting an intentional fire in the context of the qualifications and requirements of her job as a Pennsylvania firefighter in evaluating the credibility and validity of the City of Erie's stated reason for terminating Plaintiff from employment.

(Def.'s Requested Points for Charge [34] at p. 3, ¶ 7.)

This appears to be merely another way of arguing that the Court failed to accept the City's proffered explanation for Wolski's termination.  As we have seen however, there was ample evidence in the record to suggest that the City's decision-makers based their employment decision at least partly on unsubstantiated fears that Wolski would pose a threat to others by virtue of her mental illness and medications.  The jury was free to credit or reject the City's proffered explanation for its adverse employment action, and it was not unreasonable for the jury to conclude on this record that the City failed to satisfy its burden of proving that it would have fired Wolski even absent any considerations about her mental impairment.

Moreover, insofar as the City's requested point for charge is concerned, we find no error or unfair prejudice by virtue of its omission.  The significance to the City of a firefighter who intentionally sets a fire was a point that defense counsel forcefully argued throughout the trial and during closing statements.  Accordingly, the Court rejects the City's argument that a mixed-motives charge was improper and/or that the trial evidence was legally insufficient to satisfy a finding of disability related discrimination.

### D.  Legal Remedy

Having thus concluded that the trial record is insufficient to support Wolski's theory that she was regarded as disabled, we must determine what legal remedy, if any, is appropriate.  Here, the jury was properly instructed that Wolski had to establish

"disability" within the meaning of the ADA as a necessary element of her prima facie case.  The jury was further instructed, however, that Wolski could establish disability under either a "record" theory or a "regarded as" theory.  At trial, we found the evidence sufficient to support a finding that Wolski had a record of disability and, for the reasons previously discussed, we have concluded that the City's post-trial challenges to that ruling have been waived.

Significantly, the case was submitted to the jury (albeit absent any objections from counsel) with a general verdict form which simply asked, "Do you find the Defendant, the City of Erie, liable under the Americans with Disabilities Act based on its conduct in terminating the Plaintiff's employment?"  The jury answered this question affirmatively.  Thus, the jury clearly must have found Wolski to be "disabled" within the meaning of the ADA as a predicate for liability, yet it cannot be conclusively determined from the verdict form whether the jury concluded that Wolski was "disabled" based on a "record" theory, a "regarded as" theory, or both.

Under the precedent of this circuit, the legal ramifications of this error are clear: "Where a jury has returned a general verdict and one theory of liability is not sustained by the evidence or legally sound, the verdict cannot stand because the court cannot determine whether the jury based its verdict on an improper ground."  *Wilburn v. Maritrans GP Inc.*, 139 F.3d 350, 361 (3d Cir.1998).  *See also Brokerage Concepts v. U.S. Healthcare, Inc.*, 140 F.3d 494, 534 (3d Cir.1998) (where jury instruction invited the jury to find liability on an erroneous basis as well as a valid basis, "the proper course [was] for [the court] to remand for a new trial rather than to attempt to divine the basis of the jury's verdict"); *Limbach Co. v. Sheet Metal Workers Int'l Assoc.*, 949 F.2d 1211,

1217-18 (3d Cir.1991) ("Under this court's jurisprudence, we must set aside a general verdict if it was based on two or more independent grounds one of which was insufficient, and we cannot determine whether the jury relied on the valid ground."), *aff'd on rehearing en banc*, 949 F.2d 1241 (3d Cir.1991); *Avins v. White,* 627 F.2d 637, 646 (3d Cir. 1980) ("'Where … a general verdict may rest on either of two claims – one supported by the evidence and the other not – a judgment thereon must be reversed.'"). Because the jury was permitted to find Wolski disabled under a "regarded as" theory and because we cannot discern from the verdict slip whether the jury in fact made such a finding and/or whether it served as the sole basis for a finding of disability, we must grant the City's request for a new trial.

## IV. CONCLUSION

Based upon the foregoing reasons, the City's motion for judgment as a matter of law and/or new trial will be granted in part and denied in part.  Specifically, the City's request for judgment as a matter of law will be denied; however, its alternative request for a new trial will be granted.  An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

MARY WOLSKI,                    )
                                )
            Plaintiff,          )        Case No.  1:08-cv-289-SJM
                                )
     v.                         )
                                )
CITY OF ERIE,                   )
                                )
            Defendant.          )

**O R D E R**

AND NOW, this 28th Day of September, 2012, for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Defendant's motion for judgment as a matter of law and/or new trial [50] shall be, and hereby is, GRANTED in part and DENIED in part as follows:

1.  The Defendant's motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) shall be and, hereby is, DENIED; and

2.  The Defendant's motion for a new trial pursuant to Federal Rule of Civil Procedure 59 shall be, and hereby is, GRANTED.

IT IS SO ORDERED.

                              s/   Sean J. McLaughlin

                                   SEAN J. McLAUGHLIN
                                   United States District Judge

cm:  All counsel of record.